# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| **AQUA NORTH CAROLINA INC.,**<br>*Plaintiff,*<br><br>*v.*<br><br>**CORTEVA, INC.;**<br>**DUPONT DE NEMOURS, INC.;**<br>**EIDP, INC., f/k/a E. I. DUPONT DE**<br>   **NEMOURS AND COMPANY;**<br>**THE CHEMOURS COMPANY;**<br>**THE CHEMOURS COMPANY FC, LLC;**<br>   *and*<br>**JOHN DOE DEFENDANTS 1-20,** *fictitious*<br>   *names whose present identities are*<br>   *unknown,*<br><br>   *Defendants.* | **C.A. No. 5:26-cv-00218**<br><br><br>**CERCLA COMPLAINT**<br>**AND**<br>**<u>JURY TRIAL DEMAND</u>** |

Now comes**,** AQUA NORTH CAROLINA INC. ("**Plaintiff**" or "**Aqua NC**") who files this complaint under the Comprehensive Environmental Response, Compensation and Liability Act ("**CERCLA**") against the Defendants for damages and other available relief attributable to (1) per- and poly- fluoroalkyl- based substances ("**PFAS**") contamination, or threatened contamination, of the water supplies/sources of several public water systems owned and operated by Aqua NC; and/or (2) PFAS contamination, or threatened contamination of waste water treatment plants owned and operated by Aqua NC. The subject PFAS is from discharges, disposals and/or releases of PFAS, products containing PFAS or emissions, exhausts or effluents containing PFAS that emanated or occurred— and/or are emanating and occurring—at, upon or from the Defendants' current or former Fayetteville Works Facility("**FWF**"). The plant is located at 22828 NC Highway 87 W., Fayetteville, North Carolina, which is in the vicinage of this Court.

# I. INTRODUCTION

1.      This action arises from the PFAS contamination of, or the threat of PFAS contamination to, the source waters of a portion of Plaintiff's public water drinking water systems ("**PWS**" or "**PWSs**") it owns and operates in Southeastern North Carolina, including, but not limited to, the PWSs listed in Table 1 below. It also arises from PFAS contamination of, or threat of PFAS contamination to, Plaintiff's wastewater treatment systems ("**WWTS**") that it operates in Southeastern North Carolina, including but not limited to those listed in Table 2 below.

| Table 1 | | |
|---|---|---|
| **Division** | **PWSID** | **System Name** |
| NC - East - Fayetteville | NC0326286 | Brettonwood Hills |
| NC - East - Fayetteville | NC0326127 | Brookwood Community |
| NC - East - Fayetteville | NC5026018 | Brookwood South / PWC |
| NC - East - Fayetteville | NC0326332 | Cliffdale West |
| NC - East - Fayetteville | NC0326143 | Copeland Acres |
| NC - East - Coastal | NC0465121 | Glynnwood |
| NC - East - Fayetteville | NC0326300 | Kelly Hills PW |
| NC - East - Fayetteville | NC0326375 | Raintree II PW |
| NC - East - Fayetteville | NC0326124 | Simmons Heights / Braxton Hills |
| NC - East - Fayetteville | NC0326341 | Stoney Point |
| NC - East - Coastal | NC0465199 | The Cape / Beau Rivage Master Water System |
| NC - East - Fayetteville | NC0326365 | Woodland Run PW |

| Table 2 | | |
|---|---|---|
| **Division** | **Permit** | **System** |
| NC - East - Coastal | NC0057703 | The Cape Wastewater |
| NC - East - Coastal | WQ0018755 | Castle Bay Wastewater |
| NC - East - Coastal | WQ0030775 | Avendale Wastewater |
| NC - East - Coastal | NC0065480 | Beau Rivage Wastewater |

2.      Aqua owns and operates a number of PWS's and WWTP's in specific certificated territories located in southeastern North Carolina, and in particular those identified in Tables 1 and

2. The PWS's at issue in this case serve areas and populations in North Carolina's Bladen, Brunswick Cumberland, New Hanover, and Pender Counties.

3. Aqua's PWS systems identified in Table 1 (collectively referred to herein as the "**Public Water Systems**") either have already been shown to be contaminated with one or more dangerous PFASs, including perfluorooctanesulfonic acid ("**PFOS**"), perfluorooctanoic acid ("**PFOA**") and the ammonium salt of hexafluoropropylene oxide dimer acid (also known as "**GenX**"), or are positioned such to be materially threatened with being polluted with these PFAS present in the environment of Southeastern North Carolina due to PFAS releases that have occurred at and from the FWF. PFAS contaminated water present in the Public Water Systems' service areas eventually flow into Aqua NC's WWTPs, including those identified in Table 2.

4. Plaintiff is a wholly owned corporate subsidiary of Essential Utilities, Inc. It is in the business of owning and /or operating public water and public wastewater treatment utilities throughout the State of North Carolina. Overall, it owns and operates 737 public water systems in North Carolina that serve approximately 325,000 customers located in more than 51 counties throughout the State. It also owns and operates 59 wastewater facilities in the State.

5. Aqua NC has been granted the authority to operate public water systems and wastewater treatment utility franchises under and pursuant to certificates of public convenience and necessity issued by the North Carolina Utilities Commission ("**NCUC**"). It also is authorized to operate its public water systems and wastewater treatment plants under and pursuant to permits issued to it by the North Carolina Department of Environmental Quality ("**NCDEQ**").

6. The source waters of many public water systems and authorities located in Bladen, Brunswick Cumberland, New Hanover, and Pender Counties, North Carolina, including the Public Water Systems owned by Aqua NC and those water companies/authorities who wholesale water to

Aqua, have either already become contaminated with PFASs emanating from the FWF's chemical manufacturing operations or stand in substantial risk of being contaminated with PFAS to a degree and point that responsive actions, measures and precautions by Plaintiff was, is or in the future may be reasonably necessary and required.

7. Plaintiff's utility services and operations are highly regulated by several governmental agencies. In addition to being subject to water quality, quantity and economic regulations issued by the NCUC, its public water supply and wastewater treatment services are required to abide by and comply with various government health and environment rules, standards and regulations addressing water safety, quality and quantity issued or adopted by the NCDEQ and the United States Department of Environmental Protection ("**EPA**").

8. Federal and North Carolina state safe drinking water standards and regulations currently in force dictate and control the amount of certain PFASs that may be present in drinking water. These standards prohibit the presence of very minute levels (measured in the low parts per trillion) of PFOA, PFOS, and GenX in water that Aqua provides to its customers. The regulations also impose obligations to test water periodically for PFAS at a substantial cost to public water companies such as Aqua NC. New North Carolina administrative regulations that are presently being considered may soon impose testing requirements on wastewater treatment plant influent water, effluent water and residual biosolids.

9. Pursuant to North Carolina laws and regulations, as well as federal law, 42 U.S.C. §300f *et seq.*, Plaintiff has a duty to exercise due care and diligence in the maintenance and supervision of its public water systems' water supplies. Towards satisfying this obligation, Aqua NC periodically tests its water sources for the presence of various PFAS, including PFOA, PFOA, and GenX. The PFAS tests are expensive to conduct and, with a few exceptions, have been paid

for by Plaintiff.

10. Pursuant to applicable state and federal legal requirements and regulations, Plaintiff also has a duty to reasonably take measures and actions to address PFAS contamination when such is either found present in a water system's source water, present in one of its system's facilities, or is threatening to infiltrate or contaminate one or more systems' water source(s) or facilities. This includes, where and when necessary, undertaking remedial or precautionary responses such as further water quality testing, conducting pollution traceback studies, conducting source protection studies, performing feasibility studies on filtration systems, installation of suitable temporary or permanent treatment systems to remove PFASs, and/or exploring and developing alternative water supplies.

11. Some of the Public Water Systems at issue in this case obtain the water being supplied to customers solely from wells that Aqua NC owns; that is, the system is "groundwater" sourced. Public Water Systems' where Aqua NC purchases water wholesale from other utilities, comes from, in whole or part, surface water sources (*e.g.*, rivers). Where a Public Water System's water supply is in whole or part drawn from groundwater, the source well or wells are situated in aquifers that are hydrogeologically interconnected to surface waters in the area, including, but not limited to, the Cape Fear River.

12. When a PFAS—and here particularly PFOA, PFOS, or GenX— is either (a) detected in Aqua's raw water sources, water being supplied customers, or wastewater treatment systems; (b) determined to be present in the environment in such manner and location one or more of them threaten to contaminate Aqua's raw water sources or water being supplied customers, including its treatment/distribution facilities; or (c) is presently impacting or threatening to negatively impact its water systems' operations or their costs to operate, Aqua is required to take—and has undertaken

5

in many instances—necessary, timely, and reasonable response actions to investigate, monitor, contain, remove, mitigate, and remediate such contamination or to protect its water sources, treatment and distribution systems, wastewater infrastructure. To the extent it has already taken such response actions, the responses are consistent with applicable law and regulatory requirements, including the National Contingency Plan. Such response actions have caused Aqua NC to incur substantial response costs.

13. A significant source of the PFAS in the environment that has been contaminating and threatening domestic water sources throughout Southeastern North Carolina in epidemic proportions, including Aqua NC's Public Water Systems', is the FWF owned and operated by the named Defendants or their respective corporate predecessors.

14. Beginning in or about the 1970s and continuing for decades thereafter up to the present, Defendants (or their respective corporate predecessors) at the FWF have manufactured, utilized, marketed, and/or sold a wide array of chemicals and chemical based or created products. It produced a variety of films, fibers, processing chemicals, and specialty chemicals. Many of the items made or utilized at the plant were comprised of, contained or made through means of chemical reactions and other processing involving PFAS, including PFOA, PFOS, and GenX (all such items present at the FWF being collectively referred to as "**PFAS Related Products**").

15. Many of the PFAS Related Products made or used at the FWF plant were sold or marketed under well-known brand names such as Teflon®, Nafion®, Viton®, Kalrez® and Krytox™. Many of the PFAS Related Products included items used in or on food packaging, carpeting, cookware, upholstery, cosmetics, coatings, and many other consumer, commercial and industrial products. Often the PFAS Related Products were represented as having benefits such as resistance to heat, oil, stains, grease, chemicals, and water.

6

16. At all times material herein, the Defendants knew or had reason to know that PFASs, including but not limited to PFOA, PFOS, and GenX, present at the FWF either intentionally (such as for use as a processing agent) or unintentionally (such as those occurring as side reactions in the manufacture of other chemicals or products), posed serious risks of harm to people's health and the environment. For example, PFASs, and especially PFOA, PFOS, and GenX, are "persistent, bioaccumulative and toxic" ("**PBT**"), and exposure in humans may be associated with diseases such as cancer and disorders such decreased vaccine response. Further, PFASs, once introduced into the environment, accumulate in fish, game, and other animal and plant life, contaminate drinking water and other natural resources, and accumulate in the blood of humans. Defendants (or a defendant's corporate predecessor) knew of these risks and, further, knew PFASs could not be contained within the FWF's manufacturing facilities as well as within the final consumer and industrial products themselves once distributed or sold. Indeed, as early as the 1970s it was known by Defendants (or their respective corporate predecessors) that PFAS chemicals were already present and accumulating in the blood of DuPont employees and most Americans. Nonetheless, Defendants (or their respective corporate predecessors) concealed these substantial risks from the public and from the State of North Carolina. Moreover, for decades they even affirmatively claimed their products containing or made with PFAS were "safe."

17. The FWF is located near Duart Township in Bladen County, North Carolina, which is approximately 15 miles southeast of the City of Fayetteville and just south of the Bladen-Cumberland County line. The FWF in addition to chemical plant buildings and other infrastructure contains approximately 2,150 acres of relatively flat undeveloped open land and woodland bounded on the east by the Cape Fear River, on the west by NC Highway 87, and on the north and south by farmland. The Cape Fear River is approximately 1,850 feet from the eastern portion of the

manufacturing area, while Willis Creek, a tributary of the Cape Fear River, is approximately 3,000 feet from the northern portion of the manufacturing area. Parts of the Georgia Branch, another tributary to the Cape Fear River, flow along the FWF's southern boundary about one mile southwest of the manufacturing area. A drainage channel leading to the Cape Fear River is located south of the plant area. It is used as the outfall area ("**Outfall 002**") covered by National Pollutant Discharge Elimination System Permit No. NC003573.

18. The segment of the Cape Fear River affected by discharges from Outfall 002 is classified by the State of North Carolina as "Class WS-IV" surface water, making it a "source of water supply for drinking, culinary, or food-processing purposes" as well as for "aquatic life propagation and maintenance of biological integrity (including fishing and fish), wildlife, secondary recreation, [and] agriculture." 15A N.C.A.C. 2B.0211(1), 2B.0216(1); see also 15A N.C.A.C. 2B.0101; N.C. Gen. Stat. § 143-214.1(b).

19. Over the years the FWF has had at least six discrete manufacturing areas: (1) the Fluromonomers/Nafion area; (2) the Polymer processing aid ("**PPA**") area; (3) the Butacite area ; (4) the SentryGlas area; (5) the Polyvinyl fluoride ("**PVF**") area; and (6) the Pilot (a/k/a/ Semi-Works) area. The Plant also had a site support/waste treatment area where wastewater from each of the manufacturing areas flowed into and there through one or more on-site wastewater treatment plants. Contaminated wastewater process at the FWF was diluted with hundreds of thousands of gallons of river water in these treatment plants before it is ultimately discharged into the Cape Fear River. This dilution makes chemicals discharged from the FWF harder to detect but does not ultimately reduce the number of contaminants flowing into the Cape Fear River.

20. On information and belief, including government reports and submissions, the FWF had numerous sources and occurrences of hazardous substance emissions, including sources and

occurrences of PFOA, PFOS, and GenX emissions, which have extensively polluted the water, soil, and air environments outside of the plant's boundaries, often at tremendous distances away from the plant. These hazardous substances releases and discharges have eventually contaminated, or now threaten to contaminate, Aqua NC's Public Water Systems' water supplies.

21. During the FWF's operations, hazardous PFAS chemical substances, including in particular PFOA, PFOS, and GenX—were spilled, released, emitted and/or discharged onto the ground, into surface and ground waters, and into atmosphere from various manufacturing operations conducted at the plant. The discharges, releases and emissions were in liquid, particulate, and gaseous forms. They emanated from various piping, valves, joints, kettles, vents, columns, vessels, openings, drains, sewers, and exhaust outlets comprising the chemical manufacturing systems at the plant. They also emanated from discharges occurring from the FWF's on-site waste treatment facilities. There was also at least one exhaust stack at the FWF that has operated for many years, and which is and was a source of airborne emissions of PFAS, including but not limited to PFOA and GenX.

22. PFAS chemicals, including PFOA, PFOS and GenX, that were discharged from the plant traveled through multiple means and pathways into the surface waters and underground aquifers of the Southeastern North Carolina region in which the FWF was sited. The widespread pollution of these water resources in turn has contaminated or created a substantial threat of contamination to domestic water sources throughout Southeastern North Carolina, including those that supply Aqua NC's Public Water Systems.

23. Aqua NC's Public Water Systems and WWTPs in southeastern North Carolina have been contaminated already with or are being threatened by PFAS pollutants that were released into the atmosphere at the FWF.

24. In addition to being a significant source of PFASs polluting the breathing air in the Southeastern North Carolina region, PFAS releases occurring at or from the FWF into the atmosphere over the course of many years are also a significant source of the PFOA and GenX being found in surface and ground waters throughout the Southeastern North Carolina region. Airborne PFAS particles entrained in air can and do travel with the wind in all directions from the plant over the course of year and often travel great distances away from the FWF. Due to their physical and chemical properties (including being practically indestructible and forever lasting) airborne PFAS particulates eventually fall to the earth where they contaminate any surface water or surface soil onto which it falls and contacts. PFAS landing on the ground eventually dissolves and, in turn, then leaches, runs or percolates into local surface and ground water bodies. Plume modeling conducted in 2002 by DuPont engineers demonstrates that DuPont's PFOA manufacturing processes would give rise to an airborne APFO (a form of PFOA) plume with a "hot spot" directly over Willis Creek, a waterway that flows into the Cape Fear River.[1] Air modeling shows that thousands of square miles around the FWF have been affected by the plant's PFAS air emissions.

25. PFAS contaminated water received in public wastewater treatment plants for processing, including Aqua NC's, are also imposing PFAS related issues, problems, and costs.

26. As a direct and foreseeable consequence of the foregoing PFAS releases and discharges at the FWF, Plaintiff has suffered substantial damage and harm to its water sources, water supply and WWTP infrastructure and facilities that was proximately caused by the Defendants' acts, activities and omissions described herein. Alternatively, some of Plaintiff's water

---

[1]See also, *Legacy, and emerging airborne per- and polyfluoroalkyl substances (PFAS) collected on PM2.5 filters in close proximity to a fluoropolymer manufacturing facility,* https://pubs.rsc.org/en/content/articlelanding/2022/em/d2em00358a/unauth

sources, infrastructure and facilities are substantially being materially threatened by the PFAS releases and discharges.

27.     In carrying out its powers, purposes and duties as mandated by applicable laws and regulations, the Plaintiff is acting in all respects for the benefit of the people receiving its water, and for the protection of their health, welfare and prosperity.

28.     The Defendants have willfully, wantonly, recklessly and/or negligently discharged potentially cancer-causing chemicals into the Cape Fear River, groundwater and airshed, all of which in turn have and continue to transport and migrate to and thereby contaminate the source or sources of drinking water for thousands of North Carolina residents.

29.     Knowing that their conduct was illegal and harmful to human health and the environment, Defendants misled and lied to government regulators, claiming that they were disposing of PFASs at secure, off-site facilities or were properly incinerating or otherwise eliminating them.

30.     Because Plaintiff as a local water provider and WWTP operator did not know that the Defendants for many years were discharging PFASs (including discharges of PFOA, PFOS and GenX) at the plant and into the Cape Fear River, into the groundwater, and into the airshed —and ultimately into local water supplies, contaminating them— Plaintiff was prevented and could not timely determine, design and put into effect appropriate measures to, among other precautions and remedial measures, treat public water supplies for the PFAS contamination Defendants has caused.

31.     Through this action, Aqua NC seeks to recover from Defendants Plaintiff's past and future responses and remedial costs relating to the investigation, remediation, removal, disposal, and monitoring of PFAS substances the USEPA has designated as hazardous substances under the Comprehensive Environmental Response, Compensation and Liability Act ("**CERCLA**"), namely

PFOA and PFOS, which hazardous substances are contaminating or threatening to contaminate its drinking water sources, its drinking water systems and its wastewater treatment facilities in the State of North Carolina, as well as a declaratory judgment declaring Defendants jointly and severally liable for Plaintiffs related response and remedial action costs incurred in the future.

32. This suit is separate from and without prejudice to any other suit or claims (known or unknown) relating to PFAS. This suit involves claims relating to PWS and facilities located in North Carolina counties that were excluded from the Defendants' class actions settlement and release in the *AFFF Products Liability Litigation MDL*, MDL No 2:18-mn-2873-RMG (D.S.C.) ("AFFF MDL").

33. The suit is not intended to be a products liability suit or claim against the Defendants but rather is intended to assert environmental injury claims-based claims based up CERCLA following EPA's designation of PFOA and PFOS as hazardous substances under CERCLA in 2024.

## II. PARTIES

34. **Plaintiff, AQUA NORTH CAROLINA INC.,** is a North Carolina Corporation with its principal place of business located at 202 MacKenan Court, Cary NC 27511. Plaintiff is a subsidiary of Essential Utilities Inc., one of the largest publicly traded water, wastewater, and natural gas providers in the United States.

35. Plaintiff has significant rights and property interests in the water and water sources it appropriates from groundwater wells and surface intakes that supply its Public Water Systems. The past, present and continuing contamination of those water sources with PFAS, including but not limited to PFOS, PFOA and /or GENX, inflicts damages and harms upon Plaintiff to which it has responded or will be called to respond to which under CERCLA constitutes injury to those interests for which Plaintiff is entitled to and does hereby seek damages and other appropriate relief.

The existence of PFOA and PFOS pollutants in the waters of the State supplying Plaintiff's Water System's sources, separate and separate and apart, inflict ongoing and continuing damage and harm and constitute injury to those interests for which Plaintiff is entitled and hereby does seek damages and other appropriate relief.

36. **Defendant, EIDP, INC., f/k/a E. I. du Pont de Nemours and Company** ("Old DuPont"), is a Delaware Corporation with its principal place of business at 974 Centre Road, Wilmington DE 19805-1269. It is subject to service of process via its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 North Orange Street, Wilmington DE 19801-1120. DuPont owned and operated the FWF from the early 1970s until 2015, when ownership was shifted to a DuPont spin-off company—Defendant The Chemours Company.

37. **Defendant, THE CHEMOURS COMPANY** ("Chemours Co."), is a Delaware Corporation with its principal place of business located at 1007 North Market Street, Wilmington DE 19801. It is subject to service of process via its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 North Orange Street, Wilmington DE 19801-1120.

38. On information and belief, Chemours Co. is currently one of the entities responsible for operating the FWF.

39. **Defendant, THE CHEMOURS COMPANY FC, LLC** ("Chemours FC"), is a Delaware Limited Liability Company with its principal place of business located at 1007 North Market Street, Wilmington DE 19801. It is subject to service of process via its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 North Orange Street, Wilmington DE 19801-1120.

40. On information and belief, Chemours FC is currently one of the entities responsible for operating the FWF.

13

41. **Defendant, CORTEVA, INC.** ("Corteva"), is a Delaware Corporation with its principal place of business at 974 Centre Road, Wilmington DE 19805-1269. It is subject to service of process via its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 North Orange Street, Wilmington DE 19801-1120.

42. **Defendant, DUPONT DE NEMOURS INC. f/k/a DowDuPont, Inc.,** is a Delaware Corporation, with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805 and 2211 H.H. Dow Way, Midland, Michigan 48674.

43. On June 1, 2019, DowDuPont separated its agriculture business through the spin-off of Corteva.

44. Corteva was initially formed in February 2018. From that time until June 1, 2019, Corteva was a wholly owned subsidiary of DowDuPont.

45. On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva common stock by way of a pro-rata dividend. Following that distribution, Corteva became the direct parent of E. I. Du Pont de Nemours & Co.

46. Corteva holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.

47. On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva and of another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc., to be known as DuPont ("**New DuPont**"). New DuPont retained assets in the specialty products business lines following the above-described spin-offs, as well as the balance of the financial assets and liabilities of E. I. Du Pont not assumed by Corteva.

48. Except where noted otherwise, Defendants EIDP, Inc.; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; and DuPont de Nemours, Inc. are collectively referred to as "DuPont" throughout this Complaint.

49. John Doe Defendants 1-20 are unidentified entities or persons whose names are presently unknown and whose actions, activities, omissions (a) may have permitted, caused and/or contributed to the contamination of Plaintiff's water sources or supply wells; or (b) may be vicariously responsible for entities or persons who permitted, caused and/or contributed to the contamination of Plaintiff's water sources or supply wells; or (c) may be successors in interest to entities or persons who permitted, caused and/or permitted, contributed to the contamination of Plaintiff's water sources or supply wells. After reasonable search and investigation to ascertain the John Doe Defendants' actual names, the John Doe Defendants' actual identities are unknown to Plaintiff as they are not linked with any of the Defendants on any public source.

50. Any and all references to a Defendant in this Complaint include any and all predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendant.

51. When the term "Defendants" is used alone, it refers to all Defendants named herein jointly and severally.

52. At all times material to herein, each defendant acted by and through its employees, agents, servants, officers, and directors, actual, apparent or ostensible, any or all of whom were then and there acting within the course and scope of its or their duties, agency, or authority

53. When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control

or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

54. Upon information and belief, each of the Defendants is responsible strictly under CERCLA, as well as negligently, intentionally and/or in some actionable manner, for the events and happenings referred to herein, and has caused and continues to cause injuries and damages to Plaintiff, either through the Defendants' own conduct or through the conduct of its agents, servants or employees, or due to the ownership, maintenance and/or control of the instrumentality causing them injury, or in some other actionable manner.

## III. JURISDICTION AND VENUE

55. This Court has subject matter jurisdiction over the Defendants pursuant to 28 U.S.C. §1331 and 42 U.S.C. § 9613(b) as the claims arise under federal law, namely the provisions of CERCLA.

56. Pursuant to 28 U.S.C. § 1391, Plaintiff's home venue is the United States District Court for the Eastern District of North Carolina.

57. This Court has personal jurisdiction over Defendants by virtue of each Defendants' regular and systematic contacts with North Carolina, and because they have the requisite minimum contacts with North Carolina necessary to constitutionally permit the Court to exercise jurisdiction over them consistent with traditional notions of fair play and substantial justice.

58. Plaintiff brings this civil suit, 42 U.S.C. §§ 9607(a), 9613(f)(1), and 9613(g) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA").

## IV. FACTUAL ALLEGATIONS

### A. PFOS and PFOA

59. PFAS are a family of human-made chemical compounds containing a carbon chain on which all hydrogen atoms are replaced by fluorine atoms. The carbon-fluorine bond is one of the strongest bonds in organic chemistry and the many carbon-fluorine bonds in PFAS impart their unique chemical properties. Figure 1 below shows the chemical structures of PFOS and PFOA:

*Figure 1*



Perfluorooctane Sulfonic Acid ("PFOS")          Perfluorooctanoic Acid ("PFOA")

60. PFAS have been used for decades in the manufacture of, among other things, household and commercial products that resist heat, stains, oil, and water. These substances are not naturally occurring and must be manufactured.

61. PFOA and PFOS are the two most widely studied types of these PFAS substances.

62. PFOA and PFOS have unique properties that causes them to be: (i) mobile and persistent, meaning that it readily spreads into the environment where it breaks down very slowly; (ii) bioaccumulative and biomagnifying, meaning that it tends to accumulate in organisms and up the food chain; and (iii) toxic, meaning that it poses serious health risks to humans and animals.

63. PFOA and PFOS easily dissolve in water and thus they are mobile and spread easily in the environment in multiple manners. When released in gaseous phase, PFOA and PFOS can also become aerosolized and travel through the air for great distances. They also have the capacity to be remobilized into the air from water or soil media and then travel even further from their original release or discharge point. PFOA and PFOS readily contaminate soil and then go on to

17

leach from soil into groundwater, where it can then travel significant distances from their original release or discharge point.

64. PFOA and PFOS are characterized by the presence of multiple carbon-fluorine bonds, which are exceptionally strong and stable. As a result, PFOA and PFOS are thermally, chemically and biologically stable. They also resist degradation by light, water, and biological processes.

65. Bioaccumulation occurs when an organism absorbs a substance at a rate faster than the rate at which the substance is lost by metabolism and excretion. Biomagnification occurs when the concentration of a substance in the tissues of organisms increases as the substance travels up the food chain.

66. PFOA and PFOS bioaccumulate/biomagnify in numerous ways. First, they are relatively stable once ingested, so that they bioaccumulate in individual organisms for significant periods of time. Because of this stability, any newly ingested PFOA and PFOS will be added to any PFOA and PFOS already present. In humans, PFOA and PFOS remain in the body for years.

67. PFOA and PFOS biomagnify up the food chain. This occurs, for example, when humans eat fish that have ingested PFOA and/or PFOS.

68. The chemical structure of PFOA and PFOS makes them resistant to breakdown or environmental degradation. As a result, they migrate and are persistent when released into the environment.

69. Exposure to PFASs, including in particular PFOA, PFOS and GenX, are toxic and pose serious health risks to humans and animals.

70. PFAS are readily absorbed after consumption or inhalation and accumulate primarily in the bloodstream, kidney, and liver.

18

71.     While for many years the toxic and hazardous nature of PFAS such as PFOA and PFOS were known only to the members of the industry making them, including Defendants' predecessor, E.I. DuPont De Nemours and Company. Once the truth about PFOA was publicly revealed researchers began to study the environmental and health effects associated with it and other PFAS, including a "C8 Science Panel".

72.     The C8 panel consisted of three epidemiologists specifically tasked with determining whether there was a probable link between PFOA exposure and human diseases. In 2012, the panel found probable links between PFOA and kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, pregnancy-induced hypertension (including preeclampsia), and hypercholesterolemia.

73.     In laboratory testing on animals, PFOA has caused the growth of tumors, changed hormone levels, and affected the function of the liver, thyroid, pancreas, and immune system.

74.     The injuries caused by PFASs such as PFOA, PFOS, GenX can arise months or years after exposure.

75.     Even after the C8 Science Panel publicly announced that human exposure to 50 parts per trillion, or more, of PFOA in drinking water for one year or longer had "probable links" with certain human diseases, including kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, preeclampsia, and medically-diagnosed high cholesterol, Defendants nevertheless repeatedly assured and represented to governmental entities, their customers, and the public—and continue to do so—that the presence of PFOA in human blood at the levels found within the United States presents no risk of harm and is of no legal, toxicological, or medical significance of any kind.

76.     On May 2, 2012, the EPA published its Third Unregulated Contaminant Monitoring Rule ("UCMR3"), requiring public water systems nationwide to monitor for thirty contaminants of

concern between 2013 and 2015, including PFOA.[2]

77.     In a May 2015 publication entitled "Madrid Statement on Poly- and Perfluoroalkyl Substances (PFASs)," scientists and other professionals from a variety of disciplines, concerned about the production and release into the environment of PFOA, called for greater regulation, restrictions, limits on the manufacture and handling of any PFOA containing product, and to develop safe non-fluorinated alternatives to these products to avoid long-term harm to human health and the environment.[3]

78.     On May 25, 2016, the EPA released a lifetime health advisory level (HAL) for drinking water and health effects support documents for PFOA and PFOS.[4] The EPA developed the HAL to assist government officials in protecting public health when PFOS and PFOA are present in drinking water. At that time, EPA's HAL identified the concentration of PFOS and PFOA in drinking water at or below which adverse health effects are not anticipated to occur over a lifetime of exposure as 0.07 parts per billion ("**ppb**") or 70 per trillion ("**ppt**"). The HAL was based on peer-reviewed studies of the effects of PFOS and PFOA on laboratory animals (rats and mice) and was also informed by epidemiological studies of human populations exposed to PFOS. These studies indicated that exposure to PFOS and PFOA over HAL could result in adverse health effects, including:

  a.  Developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations);

  b.  Cancer (testicular and kidney);

---

[2] *Revisions to the Unregulated Contaminant Monitoring Regulation (UCMR 3) for Public Water Systems*, 77 Fed. Reg: 26072 (May 2, 2012).

[3] Blum A, Balan SA, Scheringer M, Trier X, Goldenman G, Cousins IT, Diamond M, Fletcher T, Higgins C, Lindeman AE, Peaslee G, de Voogt P, Wang Z, Weber R. 2015. The Madrid statement on poly- and perfluoroalkyl substances (PFASs). Environ Health Perspect 123:A107–A111; http://dx.doi.org/10.1289/ehp.1509934.

[4] *See* Fed. Register, Vol. 81, No. 101, May 25, 2016, Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate.

c.  Liver effects (tissue damage);

d.  Immune effects (e.g., antibody production and immunity);

e.  Thyroid disease and other effects (e.g., cholesterol changes).

79.  In 2016, both the National Toxicology Program of the United States Department of Health and Human Services ("**NTP**") and the International Agency for Research on Cancer ("IARC") released extensive analyses of an expanding body of research regarding the adverse effects of PFAS.

80.  The NTP's work concluded that both PFOA and PFOS are "presumed to be an immune hazard to humans" based on a "consistent pattern of findings" of adverse immune effects in human (epidemiology) studies and "high confidence" that PFOA and PFOS exposure was associated with suppression of immune responses in animal (toxicology) studies.[5]

81.  IARC's analysis similarly concluded that there is "evidence" of "the carcinogenicity of . . . PFOA" in humans and in experimental animals, meaning that "[a] positive association has been observed between exposure to the agent and cancer for which a causal interpretation is . . . credible."[6]

82.  In November 2016, a team of prestigious scholars from North Carolina State University together with researchers from other institutions published a study relating to GenX as one of several PFAS detected at the King's Bluff intake site along the Cape Fear. Between June 14, 2013, and December 2, 2013, the research team took daily samples of raw water from the King's Bluff intake which was located downstream from the FWF. They also took samples from two areas

---

[5] *See* U.S. Dep't of Health and Human Services, Nat'l Toxicology Program, *NTP Monograph: Immunotoxicity Associated with Exposure to Perfluorooctanoic Acid or Perfluorooctane Sulfonate* (Sept. 2016), at 1, 17, 19, *available at* https://ntp.niehs.nih.gov/ntp/ohat/pfoa_pfos/pfoa_pfosmonograph_508.pdf.

[6] *See* Int'l Agency for Research on Cancer, IARC Monographs: *Some Chemicals Used as Solvents and in Polymer Manufacture* (Dec. 2016), at 27, 97, *available at* http://monographs.iarc.fr/ENG/Monographs/vol110/mono110.pdf.

21

located upstream from the FWF. The upstream sampling not only revealed the presence of so-called "legacy PFAS" found at King's Bluff, but also detected GenX at levels as high as 4,500 parts per trillion ("ng/L" or "ppt"), with a mean (average) concentration of Gen X of 631 ppt. Both sampling findings were well in excess of the current North Carolina state health goal of 4 ppt.

83. The North Carolina State researchers have since continued with their work as part of an ongoing GenX Exposure Study.[7]

84. GenX and the other PFAS found in the Cape Fear River have consistently been detected at levels far exceeding the EPA's interim HAL for PFOA/PFOS and North Carolina State equivalents, which safety level for each EPA has now reduced to 4 ppt. It is believed that there are a number of other chemical compounds that have not been specifically named or identified that have also been released from Defendants' operations at the FWF and have contaminated the Cape Fear River at unsafe levels for downstream and downwind consumers and the environment at large.

85. On June 19, 2017, environmental regulators in Fayetteville and Wilmington, North Carolina began to sample and test 13 locations along the Cape Fear River for the presence of GenX. Their sampling results showed that finished water drawn from four water treatment plants had GenX concentrations exceeding the state's (then) safety standard of 140 ppt, including: (a) Bladen Bluffs (790 ppt); (b) NW Brunswick (910 and 695 ppt); (c) Pender County (421 ppt); and (d) CFPUA Sweeney (1100 and 726 ppt).

86. On June 20, 2017, under extreme public pressure, Defendant Chemours announced it would "capture, remove and safely dispose of" wastewater containing GenX, instead of discharging it into the Cape Fear River. Chemours public statement did not mention that it had

---

[7] https://genxstudy.ncsu.edu/

already contaminated the groundwater with PFOA, PFPS and GenX, and its chemical manufacturing processes were still emitting GenX into the air.

87. In July 2017, the North Carolina Department of Environmental Quality ("NCDEQ") performed sampling at the FWF and found levels of PFOA, PFOS and PFOA combined and GenX as set forth in Table 3:

| Table 3 | | | |
|---|---|---|---|
| Well | PFOA | PFOS+PFOA | GenX |
| SMW-05P | 3060 ng/L | 3,060 ng/L | 21,700 ng/L |
| SMW-06 | 3,290 ng/L | 3,290 ng/L | 39,500 ng/L |
| MW-1S | 101 ng/L | 112 ng/L | 12,900 ng/L |
| INSITU-1 | | | 519 ng/l |
| SMW-11 | | | 4,770 ng/L |
| SMW-09 | | | 22,900 ng/L |
| MSMW-12 | | | 1,800 ng/L |
| LTW-01 | 95.6 ng/L | 126 ng/L | 37,000 ng/L |
| LTW-02 | | | 11,800 ng/L |
| LTW-03 | | | 12,500 ng/L |
| LTW-04 | | | 23,500 ng/L |
| LTW-05 | | | 61,300 ng/L |
| SMW-01 | | | 2,620 ng/L |

88. Although Chemours asserts it has never manufactured or used PFOA or PFOS and DuPont claims it only manufactured PFOA and not PFOS, both substances and have been found in private wells in 2017 and have been found at Chemours' plant's "Outfall 002" location as late as June 18, 2024.[8]

89. The United States Congress enacted the National Defense Authorization Act in November 2017, which included an appropriation of $42 million to remediate PFAS contamination at or from military bases. Congress at the time also devoted $7 million toward the Investing in

---

[8] https://www.deq.nc.gov/news/key-issues/genx-investigation

Testing Act, which authorizes the Center for Disease Control and Prevention ("CDC") to conduct a study into the long-term health effects of PFOA and PFOS exposure.[9]

90. In June 2018, the Agency for Toxic Substances and Disease Registry ("ATSDR") and EPA released a draft toxicological profile for PFOS and PFOA and recommended the drinking water advisory levels be lowered to 11 ppt for PFOA and 7 ppt for PFOS.[10]

91. In November 2018, the North Carolina State University Center for Human Health and the Environment released preliminary results from a study conducted on blood and urine samples taken from individuals living near the FWF plant who consumed water from private wells and from individuals living in New Hanover County. The authors reported that four newly identified PFASs—as well as older PFASs such as PFOA—were detected in the study participants' blood.

92. The university researchers further reported that 99% of the participants' blood tested positive for Nafion byproduct 2 at a median concentration of nearly 3 parts per billion (ppb). Nafion is a brand name for a perfluorosulfonic acid polymer that was developed by DuPont in the 1960s. For many years it has been manufactured at the FWF in industrial quantities. The study also determined that individuals who lived near the FWF had more PFASs in their blood than individuals who live in other places (e.g., individuals living in Raleigh, Durham, and Chapel Hill, North Carolina, as well as Dayton, Ohio).

93. On February 25, 2019, Chemours and the State of North Carolina executed a Consent Order eventually approved and entered by the Bladen County Superior Court. the Consent Order, among other things, required Chemours to provide remedial measures to certain parties

---

[9] National Defense Authorization Act for Fiscal Year 2018, H.R. 2810, 115th Congress (2017), *available at* https://www.congress.gov/115/plaws/publ91/PLAW-115publ91.pdf.

[10] ATSDR, *Toxicological Profile for Perfluoroalkyls: Draft for Public Comment* (June 2018), *available at* https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf.

24

affected by Defendants' wrongful discharge of PFASs, including households, businesses, schools, and public buildings that use drinking-water wells.

94. Specifically, the Consent Order requires Defendant Chemours to provide public water supplies, or under certain circumstances, whole-building filtration systems (along with maintenance) to those parties whose drinking-water wells are contaminated by GenX and other PFASs in a total amount exceeding 140 ppt or any applicable health advisory standard, whichever is lower. Currently the levels for PFOA and PFOS are set at 4 ppt and the level for GenX is set at 10 ppt. Under the Consent Order affected parties may alternatively opt to receive reverse osmosis systems for every drinking water sink in their building.

95. The Consent Order also requires Chemours to provide a minimum of three under-sink reverse osmosis water-filtration systems (or equivalent treatment) to any party with a drinking-water well contaminated by GenX (or any other PFC specifically listed on an attachment to the Consent Order) if the well-water tests above 10 ppt for any given compound or exceeds 70 ppt for the total concentration of all listed compounds. For any resident who receives permanent water supplies because of the Consent Order, Chemours must also pay for any and all water bills for each affected party for 20 years up to $75 per month, subject to adjustment by DEQ every 2 years for certain criteria specified in the Consent Order. Chemours is also required to provide ongoing testing of water for certain residents, as well as bottled water until the remedial measures provided for in the Consent Order are executed or a party declines the remedial measures provided therein.

96. On February 20, 2020, the EPA announced a proposed decision to regulate PFOA and PFOS under the Safe Drinking Water Act, which action the agency characterized as a "key milestone" in its efforts to "help communities address per- and polyfluoroalkyl substances (PFAS)

25

nationwide."[11] The plan at the time was for it, following a public comment period on its proposed decision, to decide whether to move forward with the process of establishing a national primary drinking water regulation for PFOA and PFOS. It ultimately decided to do so.

97.     On June 15, 2022, the EPA released new drinking HALs for four PFAS, including a Final Health Advisory level of 10 ppt for GenX. EPA's health advisories are "non-enforceable and non-regulatory" and "provide technical information to states agencies and other public health officials on health effects, analytical methods, and treatment technologies associated with drinking water contamination."[12] More specifically, EPA HALs "identify levels to protect all people, including sensitive populations and life stages, from adverse health effects resulting from exposure throughout their lives to these PFASs in drinking water."[13] The HALs are calculated to offer a margin of protection against adverse health effects and account for other potential sources of exposure beyond drinking water (*e.g.*, food, air, consumer products, etc.), which provides an additional layer of protection.[14]

98.     A few weeks later, on June 21, 2022, the EPA released new drinking water health advisory levels (HALs) for four PFASs, including new interim HALs for PFOS and PFOA that departed significantly from the 2016 EPA HAL they replaced.[15] Specifically, EPA issued HALs of

---

[11] Press Release, *EPA Announces Proposed Decision to Regulate PFOA and PFOS in Drinking Water*, Feb. 20, 2020, *available at* https://www.epa.gov/newsreleases/epa-announces-proposed-decision-regulate-pfoa-and-pfos-drinking-water.

[12] *See, e.g.*, EPA, *Drinking Water Health Advisories for PFAS Fact Sheet for Communities* at 1 (June 2022), *available at* https://www.epa.gov/system/files/documents/2022-06/drinking-water-ha-pfas-factsheet-communities.pdf. ("EPA PFAS Fact Sheet for Communities").

[13] *Id.*

[14] *See id.*

[15] *See* Fed. Register, Vol. 87, No. 36848, June 21, 2022, Lifetime Drinking Water Health Advisories for Four Perfluoroalkyl Substances.

26

0.004 ppt for PFOA and 0.02 ppt for PFOS,[16] which collectively accounted for only a small, minute fraction of the combined 70 ppt HAL that preceded them. Importantly, EPA sets these interim HALs at levels below which PFOS and PFOA could be measured using current analytic methods, meaning in essence that the mere detection of PFOS or PFOA in a water provider's system would be sufficient on its own to exceed the new levels. Furthermore, the US EPA has set a PFASs goal of zero (0) for PFOA and PFOS.

99. As support for its decision, EPA explained that science had evolved since 2016 and that the new interim HALs for PFOS and PFOA were "based on human studies" that "found associations between PFOA and/or PFOS exposure and effects on the immune system, the cardiovascular system, human development (e.g., decreased birth weight), and cancer." [17] Specifically, EPA had performed updated health effects analyses for PFOS and PFOA to provide support for the drinking water regulations the agency planned to adopt for the two chemicals under the Safe Drinking Water Act (SDWA). Based on these analyses, EPA concluded that "the levels at which negative health effects could occur are much lower than previously understood when EPA issued the 2016 health advisories for PFOA and PFOS – including near zero for certain health effects."[18] For this reason, the agency determined there was a "pressing need to provide updated information on the current best available science to public health officials prior to finalization of

---

[16] *Id.* Fed. Register, Vol. 87, No. 36848, June 21, 2022, Lifetime Drinking Water Health Advisories for Four Perfluoroalkyl Substances.

[17] EPA, *Drinking Water Health Advisories for PFAS Fact Sheet for Communities* at 1-2 (June 2022), *available at* https://www.epa.gov/system/files/documents/2022-06/drinking-water-ha-pfas-factsheet-communities.pdf.

[18] EPA, *Drinking Water Health Advisories for PFAS Fact Sheet for Public Water Systems* at 2 (June 2022), *available at* https://www.epa.gov/system/files/documents/2022-06/drinking-water-ha-pfas-factsheet-water-system.pdf.

the health effects assessment."[19]

100. Because the referenced health analyses were still undergoing final review by EPA's Science Advisory Board, the agency stated that the new interim HALs for PFOS and PFOA are subject to change. EPA has indicated, however, that it does not anticipate any changes resulting in revised HALs for PFOS and PFOA that are greater than the 4 ppt minimum reporting level[20] that applies to Public Water Systems.[21]

101. On September 6, 2022, EPA published a notice of proposed rulemaking seeking public comment on its plan to designate PFOS and PFOA as hazardous substances under CERCLA.[22] Pursuant to that notice, all comments from the public were to be submitted by November 7, 2022.

102. Effective July 8, 2024, the EPA designated PFOA and PFOS including their salts structural isomers as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA).

103. Mandatory sampling of wastewater treatment plants for PFAS presently is not required by environmental agency regulations. However, the NCDEQ together with the North Carolina Environmental Management Commission are presently considering whether publicly

---

[19] EPA Office of Water, EPA Doc. No. 822-R-22-003, *INTERIM Drinking Water Health Advisory: Perfluorooctanoic Acid (PFOA) CASRN 335-67-1* at 18 (June 2022), *available at* https://www.epa.gov/system/files/documents/2022-06/interim-pfoa-2022.pdf; EPA Office of Water, EPA Doc. No. 822-R-22-004, *INTERIM Drinking Water Health Advisory: CASRN 1763-23-1* at 18 (June 2022), *available at* https://www.epa.gov/system/files/documents/2022-06/interim-pfos-2022.pdf.

[20] As EPA's website explains, the Minimum Reporting Level ("MRL") for Unregulated Contaminant Monitoring Rule (UCMR) 5 is the minimum quantitation level that, with 95 percent confidence, can be achieved by capable analysts at 75 percent or more of the laboratories using a specified analytical method. The MRLs in EPA's chart are based on the UCMR 5 requirement to use EPA Method 533.

[21] EPA, *Drinking Water Health Advisories for PFAS Fact Sheet for Public Water Systems* at 2 (June 2022), *available at* https://www.epa.gov/system/files/documents/2022-06/drinking-water-ha-pfas-factsheet-water-system.pdf.

[22] *See* Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances, 87 Fed. Reg. 54415 (Sep. 6, 2022).

owned wastewater treatment works (**POTWS**) should be administratively required to regularly test for PFOA, PFOS and GenX analytes. While Aqua NC has not in the past routinely tested influents effluents and biosolids in its WWTPs for PFASs, it did enroll two of its WWTPs, The Cape WWTP (which is listed in Table 2) and the Woodlake Country Club WWTP (NC0061719), which is located in Moore County, in NCDEQ's 2023 PFAS Study on Wastewater Treatment Plants and Biosolids. As part of the study the enrolled plants' influents, effluents and biosolid (residuals) were tested by the NCDEQ for a number of PFASs, including PFOA, PFOS and GenX. With respect to Cape WWTP, the assay results found GenX present in the facility's effluent water and both PFOA and PFOS present in the facility's biosolids and effluents. Based upon results of the NCDEQ's testing of the Cape WWTT along with the positive findings of PFASs (including PFOA and PFOS) in many of Aqua NC's PWS listed Table 1 *supra*, it is believed that Plaintiff's other wastewater treatment plants identified in Table 2 *supra* may also be similarly contaminated, with PFOA, PFOS and GenX, giving rise to, at least, a need to conduct expensive PFAS testing of these systems' influents, effluents and biosolid residuals. The testing may be on an ongoing basis, and depending on the sampling results additional response and remedial measure may be required.

104. The results of biological testing conducted around the FWF indicate that GenX and other PFASs contaminated plants and vegetables in environs outside the Plant. During a video call between Dutch scientists in Dordrecht, Netherlands, who were studying GenX contamination at the FWF, and North Carolina's NCDEQ science advisory board, the Dutch scientists noted that carrots, beets, lettuce, and other vegetables at 10 sites around the FWF had been tested for PFASs. Approximately 40% were contaminated with GenX and/or PFOA. Thus, North Carolina residents may have been or are currently eating—as well as drinking—PFASs and other toxic chemical compounds discharged at the FWF.

29

105. On April 10, 2024, EPA announced adoption of enforceable levels for PFOA and PFOS in drinking water. EPA set maximum containment levels (MCLs) for PFOA and PFOS at 4.0 ppt (also expressed as ng/L). According to the EPA's announcements on the new levels, EPA required PWSs to test for these PFASs starting in 2027 and until 2029 to comply with the MCLs for PFOA and PFOS. EPA has since announced an intention to extend the MCLs compliance deadlines to 2031. [23] As of the commencement date of this action, there is ongoing litigation over the date on which compliance with the MCL's will be required as well as over the EPA's standards relating to GenX .[24]

106. Effective July 9, 2024, the EPA designated both PFOA and PFOS as "hazardous substances" under CERCLA because EPA determined that "they may present a substantial danger to the public health or welfare or the environment when released." [25]

**B.      Defendants' Manufacture, Marketing and Sale of PFASs-Containing Products**

107. DuPont, then formally known as E.I. DuPont De Nemours and Company ("Old DuPont"), began manufacturing products containing PFOA in 1951. Since the 1980s, Defendants have made and used PFASs at its FWF, including but not limited to PFOA and GenX. When DuPont's PFOA supplier, the 3M Company, decided in 2002 to phase out its production of PFOA after coming under increasing scrutiny from the EPA, Old DuPont began increasing its manufacturing of PFOA at the FWF, assuring regulators and the public that PFOA was safe and that any wastewater containing PFOA would be disposed of at a secure, off-site facility.

108. In the early 2000s, when government regulators pressured Old DuPont to stop using

---

[23] https://www.epa.gov/newsreleases/epa-announces-it-will-keep-maximum-contaminant-levels-pfoa-pfos. (Last visited Mar. 29, 2026).

[24] See *e.g., American Water Works Association, et al., v. EPA*, No. 24-1188 (D.C. Cir. June 07, 2024).

[25] *See* Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances 89 Fed. Reg. 39124 May 8, 2024.

PFOA in its manufacturing processes, Old DuPont (and later Chemours Co. too) began to replace PFOA with its close chemical cousin GenX. However, GenX may be even more toxic than PFOA. In addition, Defendants (or their respective predecessors) have continued to discharge "Nafion byproducts" 1 and 2, which are long-chain C7 PFAS, which are produced only by Defendants and which have toxicity characteristics that are similar to PFOA.

109. Old DuPont began using PFOA and other PFASs in its specialty chemical production applications, including household applications and products, like Teflon® and Stainmaster®. Old DuPont advertised Teflon® as a protective non-stick coating for cookware and Stainmaster® as a soil and stain repellant for fabrics and textile products. For instance, Old DuPont released Stainmaster® Carpet in 1986. Old DuPont advertised this product as being helpful for families with children and pets, which is particularly concerning due to the additional exposure for children, who spend more time on or near the floor.

110. Old DuPont also manufactured and advertised Zonyl® as a cheaper and less-intensive alternative to wax paper food packaging beginning in the1960s. On information and belief, this material has been used for fast food packaging and microwave popcorn bags, among other consumer uses.

111. On information and belief, the Teflon® PTFE chemical has been used in a wide variety of cosmetics, to make them long-lasting and easier to apply.

112. As early as the 1960s, Old DuPont became aware that PFOA is toxic to animals and humans and that it bioaccumulates and persists in the environment. Old DuPont also knew that Teflon and the industrial facilities associated with its manufacture emitted and discharged large quantities of PFOA and other PFASs into the environment and in turn many people had been exposed to its PFASs, including being exposed via public and private drinking water supplies. Yet,

31

Old DuPont continued to develop and market PFAS products for consumers as safe and without revealing this knowledge that would have been material information to consumers' purchasing decisions.

113. Old DuPont's scientists issued internal warnings about PFOA toxicity as early as 1961, including warnings that PFOA caused adverse liver reactions in rats and dogs. Old DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care" and that contact with the skin should be "strictly avoided." However, in stark contrast advertisements during the 1970s promoted family and household use of Teflon® pans through "women [who] test[ed] pans like these in their own homes"—touting the "preference" of Teflon® by these women and the implied safety for family and household use while failing to disclose the already known dangers associated with PFAS.

114. In 1978, based on information received from 3M about elevated and persistent organic fluorine levels in workers exposed to PFOA, Old DuPont initiated a plan to review and monitor the health conditions of potentially exposed workers to assess whether any negative health effects were attributable to PFOA exposure. This monitoring plan involved obtaining and analyzing the blood samples from its workers for the presence of fluorine

115. By 1979, Old DuPont had data indicating that, not only was organic fluorine/PFOA building up in the blood of its exposed workers (and was, thus, "biopersistent"), but those workers exposed to PFOA had a significantly higher incidence of health issues than did unexposed workers. Old DuPont did not share this data or the results of its worker health analysis with the general public or government entities at that time

116. The following year, Old DuPont internally confirmed, but did not make public, that PFOA "is toxic," that humans accumulate PFOA in their tissues, and that "continued exposure is

not tolerable." However, on information and belief, at around this same time DuPont, was releasing advertisements encouraging families not to worry, because they had a Teflon® carpet protector.

117. Not only did Old DuPont know that PFOA accumulated in humans, but it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child. In 1981 Old DuPont conducted a blood sampling study of pregnant or recently pregnant employees. Of the eight women in the study who worked with Teflon®, two (25%) had children born with birth defects in their eyes or face, and at least one had PFOA in the umbilical cord. Instead of informing its own workers and addressing these alarming findings, Old DuPont that same year communicated to its employees that "there is no evidence that our employees have been exposed to C8 levels that pose adverse health effects." "C8" refers to PFASs like PFOA and PFOS with an eight-carbon chain structure. Old DuPont then quietly moved female employees away from areas where PFOA may be or have been present.

118. In March of 1982, Old DuPont selectively reported to the EPA that results from a *rat* study showed PFOA crossing the placenta if present in maternal blood while concealing the results of its own study of its *human* workers.

119. Not only did Old DuPont know about PFOA's toxicity danger as early as the 1960s, but it was also aware that PFASs were capable of contaminating the surrounding environment, leading to human exposure. For example, no later than 1984, Old DuPont was aware that PFOA released from its manufacturing operations was contaminating local drinking water supplies but said nothing to regulators or the impacted communities.

120. Old DuPont was long aware that PFASs it was releasing from its facilities could leach into ground water used for public drinking water – a fact that could both impact its corporate image, as discussed below, and materially impact end product consumer's purchasing decisions. In

33

1984, Old DuPont held a meeting at its corporate headquarters in Wilmington, Delaware to discuss health and environmental issues related to PFOA. The employees in attendance spoke of PFOA issues as "one of corporate image, and corporate liability." The were resigned to Old DuPont's "incremental liability from this point on if we do nothing" because Old DuPont was "already liable for the past 32 years of operation." They also stated that the "legal and medical [departments within Old DuPont] will likely take the position of total elimination" of PFOA use in DuPont's business and that these departments had "no incentive to take any other position." Nevertheless, Old DuPont not only decided to keep using and releasing PFOA, marketing product brands containing PFOA, but affirmatively misrepresenting to regulators, the scientific community, and the public that its PFOA releases presented no risks to human health or the environment.

121. An internal "personal and confidential" memo prepared by Old DuPont personnel attending the meeting (depicted in *Figure 2*) documents the corporate consensus positions reached during the meeting:

*[Balance of page intentionally blank.]*

34

*Figure 2*

```
PERSONAL & CONFIDENTIAL
-------------------------

   TO: T. M. KEMP
       T. L. SCHRENK

FROM: J. A. SCHMID

                    C-8 MEETING SUMMARY
                    5/22/84 - WILMINGTON
                    --------------------------

        THE REVIEW WAS HELD WITH BESPERKA, BENNETT, RIDDICK,
GLEASON, HEGENBARTH, SERENBETZ, RAINES, KENNEDY, VON SCHRILTZ, AND
INGALLS IN ATTENDENCE. COPIES OF THE CHARTS USED ARE ATTACHED.

        THERE WAS A CONSENSUS THAT C-8, BASED ON ALL THE
INFORMATION AVAILABLE FROM WITHIN THE COMPANY AND FROM 3M, DOES
NOT POSE A HEALTH HAZARD AT LOW LEVEL CHRONIC EXPOSURE.

        THERE WAS AGREEMENT THAT A DEPARTMENTAL POSITION NEEDED
TO BE DEVELOPED CONCERNING THE CONTINUATION OF WORK DIRECTED AT
ELIMINATION OF C-8 EXPOSURES OFF PLANT AS WELL AS TO OUR CUSTOMERS
AND THE COMMUNITIES IN WHICH THEY OPERATE.

        THERE WAS CONSENSUS REACHED THAT THE ISSUE WHICH WILL
DECIDE FUTURE ACTION IS ONE OF CORPORATE IMAGE, AND CORPORATE
LIABILITY. LIABILITY WAS FURTHER DEFINED AS THE INCREMENTAL
LIABILITY FROM THIS POINT ON IF WE DO NOTHING AS WE ARE ALREADY
LIABLE FOR THE PAST 32 YEARS OF OPERATION. CORPORATE IMAGE
DISCUSSION CENTERED AROUND THE PERCEIVED DILIGENCE VERSUS OUR
POLICIES IF WE ELECTED TO STOP WORK.

        CURRENTLY, NONE OF THE OPTIONS DEVELOPED ARE, FROM A
FINE POWDER BUSSINESS STANDPOINT, ECONOMICALY ATTRACTIVE AND WOULD
ESSENTIALLY PUT THE LONG TERM VIABILITY OF THIS BUSSINESS SEGMENT
ON THE LINE. FROM A BROADER CORPORATE VIEWPOINT THE COSTS ARE
SMALL.

        THE BASIS FOR A DECISION AT THIS POINT IS SUBJECTIVE AND
IS MADE MORE DIFFICULT BY OUR CURRENT UNDERSTANDING OF TECHNOLOGY
AND COST, AND THE IMPACT ON THE FINE POWDER BUSSINESS. IT'S NOT AN
EASY AND OBVIOUS DICISION AS FOR EXAMPLE TBSA WAS.
```

122.     Despite knowledge of potential health hazards and contamination, Old DuPont subsequently introduced Stainmaster® carpet to the public in 1986, spending $10 million on the first campaign of national advertisements. Old DuPont marketed Stainmaster® carpet as safe for families and targeted families with babies in particular, through advertisements, whose misleading messages Old DuPont aimed to get into every American household.

123.     As a result, infants and toddlers in homes with Stainmaster® carpets were consistently exposed to PFAS. According to the CDC, infants and toddlers are at increased risk of ingesting these chemicals through hand-to-mouth transfer of PFAS from carpets. Similarly, the

EPA reported that children are particularly susceptible to inhaling PFAS in carpets, with inhalation levels reaching 32,500 pg/cm$^3$.

124. Old DuPont also continued to advertise its Teflon® brand for household use, touting nonstick benefits but failing to disclose to consumers the serious adverse effects of PFAS.

125. A January 2000 email from an Old DuPont employee, depicted in *Figure 3*, establishes that the company was aware of C8's biopersistence and that biopersistence was an important consumer issue due to "an overwhelming public attitude that anything biopersistent is harmful." Nevertheless, Old DuPont continued to conceal the biopersistence of PFAS in chemical products such as Teflon®.

*Figure 3*



126. Old DuPont's response to the issue was to, among other things, begin assembling a litigation defense team. The team included an outside consulting company called the Weinberg Group. In a 2003 letter to Old DuPont, the Weinberg Group recommended that Old DuPont "implement a strategy at the outset which discourages government agencies, the plaintiff's bar, and misguided environmental groups from pursuing this matter any further …" The strategy would

36

include "facilitating the publication of papers and articles dispelling the alleged nexus between PFOA and teratogenicity as well as other claimed harm" and "establish[ing] not only that PFOA is safe over a range of serum concentration levels, but that it offers real health benefits …"

127. In 2004, EPA filed an administrative enforcement action against DuPont based on its failure to disclose toxicity and exposure information for PFOA in violation of the federal Toxic Substances Control Act ("TSCA") and Resource Conservation and Recovery Act ("RCRA"). Old DuPont eventually settled the lawsuit by agreeing to pay over $16 million in civil administrative penalties and conduct supplemental environmental projects. EPA called the settlement the "largest civil administrative penalty EPA has ever obtained under any federal environmental statute."

128. Old DuPont's had its own Epidemiology Review Board ("ERB"). This board repeatedly raised concerns about Old DuPont's statements to the public that there were no adverse health effects associated with human exposure to PFOA. For example, in February 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [Old DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

129. Old DuPont advertised consumer brands using PFAS chemicals as safe for home use in a variety of contexts. On information and belief, all of the advertisements throughout this section promoted products containing PFAS chemicals. The advertisements, which include television advertisements, range in time from the 1960s to the early 2000s.

130. In February 2006, the New York Times noted that Old DuPont ran full page advertisements in its newspaper and other newspapers continuing to state that Teflon® is safe.

131. Despite its knowledge regarding PFOA's toxicity, Old DuPont continued to claim that PFOA posed no health risks. On information and belief, Old DuPont continued to market and

37

sell Teflon® containing PFOA until 2007. Old DuPont knew these statements were not true but did not correct them.

**C.     DuPont's Multi-Step, Years-Long Scheme Resulting in New Companies Assuming PFASs Liabilities.**

132.    In or about 2013, Old DuPont began planning a series of corporate restructurings designed to separate its valuable assets from its billions of dollars of legacy liabilities, especially those arising from its historical use of PFOA and other PFAS.

133.    For more than five decades, Old DuPont manufactured, produced, or utilized PFOA and other PFAS at plants in New Jersey, West Virginia, and North Carolina, among others. By 2013, Old DuPont knew it was facing an avalanche of claims related to its PFAS business.

134.    For example, a 2012 health study—funded by Old DuPont pursuant to a 2005 class action settlement—confirmed "probable links" between PFOA exposure and several serious human diseases: (a) medically diagnosed high cholesterol, (b) ulcerative colitis, (c) pregnancy induced hypertension, (d) thyroid disease, (e) testicular cancer, and (f) kidney cancer. As a result, more than 3,500 class members with one or more of those linked diseases filed personal injury claims against Old DuPont. Under the terms of the 2005 class settlement, Old DuPont had agreed not to contest the fact that the class members' exposure to PFOA could have caused each of the linked diseases, significantly limiting Old DuPont's available defenses to liability.

135.    Anticipating significant PFAS liability exposure, Old DuPont convened an internal initiative known as "Project Beta" in or about 2013 for Old DuPont's management to consider restructuring the company in order to, among other things, avoid responsibility for the widespread harm that Old DuPont's PFAS had caused, and shield billions of dollars in assets from these substantial liabilities.

136.    At the same time, Old DuPont and The Dow Chemical Company ("**Dow**") were

discussing a possible "merger of equals." But no rational merger partner, including Dow, would agree to a transaction that would expose it to the substantial PFAS and environmental liabilities that Old DuPont faced.

137. Accordingly, Old DuPont's management decided to pursue a multi-year corporate restructuring specifically orchestrated to isolate Old DuPont's massive legacy liabilities from its valuable tangible assets in an attempt to entice Dow to pursue the proposed merger.

138. Old DuPont engaged in a coordinated three-part restructuring plan that consisted of (i) Old DuPont's attempt to cast off its massive "performance chemicals" portfolio liabilities onto Chemours, a then newly-formed wholly owned subsidiary, and spinning off Chemours as a separate publicly traded company; (ii) the creation of a new DuPont entity (eventually known as DuPont de Nemours, Inc. ("New DuPont")), to facilitate a purported merger with Dow; and (iii) a series of internal restructurings and divestitures that resulted in the spinoff of Old DuPont to its newly formed parent, Corteva. In the end, the New DuPont and Corteva assumed Old DuPont's liabilities related to, among other things, its use and manufacture of PFAS chemicals, and are therefore directly liable for Old DuPont's conduct at issue in this case.

139. In greater detail, the restructuring scheme was implemented as follows:

**Step 1:    The Chemours Spinoff**

140. The first step in Old DuPont's scheme was to create and establish Chemours as a wholly owned subsidiary and transfer Old DuPont's "performance chemicals" business, which included Teflon® and other products associated with Old DuPont's historic use of PFOA ("**Performance Chemicals Business**") to Chemours. Then, on July 1, 2015, Old DuPont spun off Chemours as a separate public entity and saddled Chemours with Old DuPont's massive legacy liabilities (the "**Chemours Spinoff**").

39

141. To effectuate the Chemours Spinoff, Old DuPont and Chemours entered into a June 26, 2015, Separation Agreement (the "**Chemours Separation Agreement**").

142. Pursuant to the Chemours Separation Agreement, Old DuPont agreed to transfer to Chemours all businesses and assets related to the Performance Chemicals Business, including 37 active chemical plants. The FWF is one of those plants.

143. Chemours, in turn, broadly assumed Old DuPont's massive liabilities relating to Old DuPont's Performance Chemicals Business and other unrelated business lines, set forth in detail in the nonpublic schedules and exhibits to the Chemours Separation Agreement.

144. Specifically, the Chemours Separation Agreement requires Chemours to indemnify Old DuPont against, and assume for itself, all "Chemours Liabilities," which are defined broadly to include, among other things, "any and all Liabilities relating . . . primarily to, arising primarily out of or resulting primarily from, the operation or conduct of the Chemours Business, as conducted at any time prior to, at or after the Effective Date," which includes Old DuPont's historic liabilities relating to and arising from its marketing and operation of the Performance Chemicals Business, such as its liabilities arising from PFAS.

145. In addition to requiring Chemours to assume billions of dollars of Old DuPont's PFAS liabilities, the Chemours Separation Agreement includes an indemnification of Old DuPont in connection with those liabilities, which is uncapped and does not have a survival period.

146. Notwithstanding the billions of dollars in PFAS liabilities that Chemours would face, on July 1, 2015, Old DuPont caused Chemours to transfer to Old DuPont approximately $3.4 billion as a cash dividend, along with a "distribution in kind" of promissory notes with an aggregate principal amount of $507 million. In total, Old DuPont extracted approximately $3.9 billion from Chemours.

147. Old DuPont required Chemours to fund these distributions through financing transactions, including senior secured term loans and senior unsecured notes totaling approximately $3.995 billion, on May 12, 2015.

148. Old DuPont, however, transferred only $4.1 billion in net assets to Chemours. At the end of 2015, Chemours reported a total net worth of just $130 million. But Chemours's estimated liabilities, which at the time totaled $6.168 billion—vastly underestimated the true value of its liabilities, including the PFAS liabilities it had assumed from Old DuPont, which Chemours knew or should have known would cost it billions of dollars.

149. In fact, Old DuPont spun off Chemours into a state of insolvency. Indeed, Old DuPont left Chemours so undercapitalized that in May 2019, Chemours sued DowDuPont Inc., Corteva Inc. and E.I. Du Pont De Nemours and Company in Delaware Chancery Court. *See The Chemours Company v. DowDuPont, et al.*, C.A. No. 2019-0351 (Del. Ch. Ct., filed May 13, 2019). Chemours alleged, among other things, that if (i) the full value of DuPont's potential PFASs liabilities was properly estimated and (ii) Chemours were required to satisfy all the potential liabilities DuPont transferred to it, then Chemours would have been insolvent at the time it was spun off from Old DuPont.

**Step 2:    The Dow/DuPont "Merger"**

150. After the Chemours Spinoff, Old DuPont and its successors took the untenable position that it (they) was (were) no longer responsible for the widespread PFAS liabilities that it had accrued over several decades. Of course, Old DuPont could not contractually discharge all of its historical liabilities through the Chemours Spinoff, and Old DuPont and its successors remained liable for the liabilities Old DuPont had caused and Chemours had assumed.

151. Old DuPont (and its successors) knew that after the Chemours spin-off it (or they)

could not escape liability and would still face exposure to PFAS liabilities, including for potentially massive penalties and punitive damages. So, Old DuPont moved to the next phase of its restructuring scheme.

**Step 3:** **The shuffling, reorganization, and transfer of valuable assets away from DuPont and separation of Corteva and the new Dow**

152. On December 11, 2015, less than six months after the Chemours Spinoff, DuPont and Dow announced that their respective boards had approved an agreement "under which the companies [would] combine in an all-stock merger of equals" and that the combined company would be named DowDuPont, Inc. (the "DowDuPont Merger"). The companies disclosed that they intended to subsequently separate the combined companies' businesses into three publicly traded companies through further spinoffs, each of which would occur 18 to 24 months following the closing of the merger.

153. To effectuate the transaction, DuPont and Dow entered into an Agreement and Plan of Merger (the "DowDuPont Merger Agreement") that provided for the formation of a new holding company renamed first as DowDuPont and then renamed again as DuPont de Nemours, Inc. (*i.e.*, New DuPont), of which Old DuPont and Dow became wholly owned subsidiaries.

154. Although Old DuPont and Dow referred to the transaction as a "merger of equals," the two companies did not actually merge at all, likely because doing so would have infected Dow with all of DuPont's historical PFAS liabilities. Rather, Old DuPont and Dow became affiliated sister companies that were each owned by the newly formed DowDuPont. DowDuPont was aware of DuPont's historical PFAS liabilities.

155. Following the DowDuPont Merger, DowDuPont underwent a significant internal reorganization and engaged in numerous business segment and product line "realignments" and "divestitures." The net effect of these transactions has been the transfer, either directly or indirectly,

of a substantial portion of Old DuPont's assets out of the company, frustrating Old DuPont's creditors, including those related to its substantial PFASs liabilities.

156. Old DuPont's assets were transferred either directly or indirectly to DowDuPont, which reshuffled the assets and combined them with the assets of Dow, and then reorganized the combined assets into three distinct divisions: (i) the "Agriculture Business," (ii) the "Specialty Products Business," and (iii) the "Materials Science Business."

157. The mechanics of the separations are governed by the April 1, 2019, Separation and Distribution Agreement among Corteva, Dow, and DowDuPont (the "DowDuPont Separation Agreement") and a subsequent June 1, 2019, Letter Agreement between Corteva and DowDuPont (the "Letter Agreement").

158. The DowDuPont Separation Agreement allocated the assets and liabilities primarily related to the respective business divisions between the three companies: DowDuPont retained the assets and liabilities associated with the Specialty Products Business and several "non-core" business segments and product lines that once belonged to DuPont; Corteva received the assets and liabilities associated with the Agriculture Business, and the resulting Dow company received the assets and liabilities associated with the Materials Science Business.

159. DowDuPont also "contributed" the New DuPont company to Corteva, and New DuPont remains a wholly-owned subsidiary of Corteva to this day.

160. Pursuant to the DowDuPont Separation Agreement and Letter Agreement, Corteva and New DuPont also assumed direct financial liability for legacy liabilities arising from Old DuPont's historic use of PFOA and other PFASs and its former Performance Chemicals Business, i.e., the same liabilities that Old DuPont had caused Chemours to assume in 2015. While New DuPont and Corteva initially tried to bury the details in nonpublic schedules, New DuPont and

Corteva's express assumption of Old DuPont's historic liabilities has been revealed through other litigation, and includes all liability associated with PFASs. Plaintiff can therefore bring claims against New DuPont and Corteva directly for Old DuPont's release of hazardous substances at the FWF, including Old DuPont's emissions at the facility into the atmosphere and the dumping of PFASs chemicals into the Cape Fear River which have damaged Plaintiff.

161. The separation of the Dow component company was completed on or about April 1, 2019, when DowDuPont distributed all of Dow's common stock to DowDuPont stockholders as a pro rata dividend.

162. On June 1, 2019, DowDuPont spun off Corteva as an independent public company, when DowDuPont distributed all of Corteva's common stock to DowDuPont stockholders as a pro rata dividend.

163. Also, on or about June 1, 2019, DowDuPont changed its registered name to DuPont de Nemours, Inc. (i.e. New DuPont).

164. On or about January 1, 2023, the Corteva subsidiary DuPont changed its registered name to EIDP Inc.

165. The net result of these transactions was to strip away valuable tangible assets from Old DuPont—once available to satisfy successful claims brought by potential plaintiffs—and transfer those assets to the New DuPont and Corteva for consideration far less than the assets are worth.

166. Many details about these transactions were hidden from the public in confidential schedules and exhibits to the DowDuPont Separation Agreement and in the Letter Agreement. DuPont (EIDP), New DuPont, and Corteva buried these details in an apparent attempt to hide from creditors, including tort claimants like Plaintiff, where DuPont's valuable assets went and the

inadequate consideration that DuPont received in return. Moreover, neither the New DuPont nor Corteva has publicly conceded that they assumed DuPont's liabilities arising from its historic use of PFOA and other PFAS. However, certain courts have required New DuPont and Corteva to disclose the nonpublic portions of the restructuring agreements—including the DowDuPont Separation Agreement and Letter Agreement. Under the plain language of those agreements, the New DuPont and Corteva contractually assumed Old DuPont's liabilities arising from its historic use of PFOA and other PFAS and are therefore directly liable for Plaintiff's claims against DuPont in this case.

167. Indeed, several courts have already held that New DuPont and Corteva contractually assumed the Old DuPont's PFAS liabilities. The North Carolina Supreme Court, for example, had held that New DuPont and Corteva expressly assumed Old DuPont's PFAS liabilities pursuant to the DowDuPont Separation Agreement and Letter Agreement. *See State ex rel. Stein v. E. I. Du Pont De Nemours & Co.*, 382 N.C. 549, 563 (N.C. 2022) ("Corteva and New DuPont expressly assumed [Old] DuPont's PFASs liabilities, including those liabilities arising in North Carolina"). The trial court subsequently entered summary judgment against New DuPont and Corteva on the issue of their contractual assumption of the PFAS liabilities of Old DuPont. *See State ex rel. Stein v. E. I. du Pont de Nemours & Co.,* No. 20 CVS 5612, 2024 WL 472553, at *6 (N.C. Super. Feb.7, 2024).

**D. PFAS POLLUTION HARMS AND THREATS TO PLAINTIFF'S PUBLIC WATER SYSTEMS AND WASTEWATER TREATMENT PLANTS**

168. Upon information and belief, hazardous PFAS substances, including PFOA and PFOS, were disposed, spilled, discharged or otherwise released into North Carolina's environment, including into the State's air, ground and waters, at, upon or from the FWF facility during and throughout times the plant was operated and/or owned by the Defendants.

169. Defendants, or their predecessors for whom they are liable for, discharged PFOA, PFOS and/or GenX, along with other PFASs and hazardous substances, at, on or from the FWF facility knowing these chemicals or chemical compound were extremely dangerous and that even exceedingly small doses could cause liver, testicular, pancreatic, uterine and kidney cancer, as well as thyroid disease, ulcerative colitis, and pregnancy-induced hypertension, among other illnesses. Nevertheless, Defendants during their respective operation/ownership of the FWF discharged these chemicals onto the ground, into the air and into the ground and surface waters underneath or surrounding the FWF.

170. Knowing that their conduct was wrongful, Defendants misled and lied to government regulators, claiming that they were either disposing of PFAS at a secure, off-site facility or incinerating them. These falsehoods endangered the environment and nearby residents by preventing state regulators and local water providers, such as Plaintiffs, from taking actions necessary to protect the public from, inter alia, drinking or otherwise exposing themselves to dangerous amounts of PFOA, PFOS, GenX and other PFASs releases or discharged from the FWF.

171. At all times relevant to this litigation Defendants knew or had reason to know and should have known that PFASs and other hazardous substances were being released into the air, soil and waters of North Carolina and upon such release would travel to and ultimately contaminate or threaten to contaminate areas a great distance away from the FRW plant, including sizable areas of Southeastern North Carolina containing Plaintiff's water sources.

172. As a direct result of Defendants' activities, acts and omissions with respect to the operation of the FWF, hazardous substances released at, upon or from this facility have entered into and polluted the atmosphere of southeastern North Carolina, the Cape Fear River which runs adjacent to the plant, and the soil and groundwater located at, underneath and offsite from the plant,

thereby causing harm or risk of often at great distances away from the facility.

173. The hazardous substance released at or from the FWF eventually contaminated or are so situated that they threaten to contaminate the hydrogeological sources and resources from which Plaintiff obtains potable water to supply its customers.

174. PFOA, PFOS, GenX and other PFAS are exceedingly difficult and expensive to remove and remediate when released into the environment, especially where and when they enter or affect an aquifer, other bodies of water such as a lake or river, or large land masses or areas such as have occurred in Southeastern North Carolina due to the chemical manufacturing operations and activities conducted at the FWF.

175. Defendants' actions and omissions at the FWF, which contributed and are contributing to the presence of PFAS and other toxic chemicals in Plaintiff's wells and other water resources, are continuing and ongoing.

176. Several of Plaintiff's PWS in Southeastern North Carolina, including those listed in Table 1 above, have either already been contaminated with PFOA and PFOS (as well as other hazardous substances) or are threatened with being contaminated with PFOA and PFOS (as well as other hazardous substances) due to the releases, spills and discharges of PFOA, PFOS and GenX occurring at the FWF over the course of the many years the Defendants have owned and/or operated the plant.

177. As a result of the releases, discharges and spills of PFOA and PFOS (as well as other hazardous substances) from the FWF, Plaintiff's water supply sources having become contaminated with PFOA and PFOS (as well as other hazardous substances)—or are threatened with such contamination— thereby causing (or posing a substantial threat of ) injury and harm to Plaintiff which in turn has caused —or in the future will cause—Plaintiff to incur response costs to address.

47

Such response or remedial costs are in the form of, among other things, the cost of testing for PFAS; the cost for the design, engineering and installation of filter systems; the cost for installing, operating and maintaining filter system; the costs for spent filter medium disposal; and the cost for locating and obtaining substitute water supplies. All or some of these costs are continuing, and as the threat to Plaintiffs presently non-affected wells and sources continues or actualizes Plaintiff will incur all or some of these response costs in the future.

178. As a further proximate result of the Defendants' hazardous substances releases' contamination of the air and waters throughout the region of Southeastern North Carolina, Plaintiffs Coastal and Fayetteville Divisions' WWTPs that receive and treat wastewater for treatment have either (a) been contaminated with PFOA and PFOS (as well as other hazardous substances) discharged at the FWF from the contaminated waters received and undergoing treatment at the plant; or (b) are at risk of being so contaminated with PFOA and PFOS as they treat the water containing these pollutants. In this regard, Aqua NC has already incurred and/or will be forced to incur in the future response and remedial costs to address the existence of these contaminants or the threat of such contaminants entering the WWTPs. Such response and remedial costs include, but are not limited to, the costs of testing WWTP influents and the treatment plant's residual sludge for PFOA, PFOS and other PFASs. If, where and when PFOA and/or PFOS is found in one of its WWTP's influent or sludge, it is and will be required to take further steps to protect public health and the environment at substantial costs. Consequently, Plaintiff anticipates it will likely incur substantial response and remedial costs in the future relating to its WWTPs.

179. As responsible parties under CERCLA, the Defendants and not Plaintiff or its customers, should bear all past, present and future costs of addressing the above contamination.

# V. SUBSTANTIVE COUNTS

## FIRST CAUSE OF ACTION
### *COST RECOVERY LIABILITY*
### *(PURSUANT TO 42 U.S.C. § 9607 (CERCLA))*

180. Plaintiff reincorporates the preceding paragraphs above as though fully set forth herein.

181. Each Defendant is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

182. Each Defendant is an "owner" and/or "operator" within the meaning of Section 101(20) of CERCLA, 42 U.S.C. § 9601(20).

183. The FWF is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

184. PFOA and PFOS are each a "hazardous substance" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), by designation pursuant to section 102 of CERCLA, 42 U.S.C. § 9602.

185. There has been at least one release, if not several to many releases for a substantial period of time, and there continue to be releases, and/or disposal of hazardous substances from the Defendants' facilities within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

186. The hazardous substances and other PFAS released from Defendants' facilities, including GenX, have, through various transport mechanisms and means described above, migrated into and/or are migrating towards Plaintiff's Fayetteville and Costal Divisions' Public Water Systems' drinking water supplies, including those identified in Table 1 above, thereby contaminating or threatening to contaminate them.

187. Likewise, hazardous substances and other PFAS released from Defendants' facilities (including GenX) have, through various transport mechanisms and means described above,

49

migrated into and/or are migrating towards Plaintiff's Fayetteville and Costal Divisions' WWTPs, including those identified in Table 2 above, thereby contaminating or threatening to contaminate them.

188. Plaintiff has incurred and will continue to incur necessary response costs to address the release or threatened release of hazardous substances and PFAS from Defendants' facilities. These costs will include investigating, monitoring, remediating and otherwise responding to the contamination of its PWS, including the Public Water Systems listed in table 1 above, and/or its WWTPs in the vicinity of its affected Public Water Systems, including those listed in Table 2 above, to stem the threat to public health and the environment caused by Defendants.

189. Specifically, Plaintiff has incurred and /or will be forced to incur significant costs relating to all or some of the following: (a) sampling its water for PFOA and PFOS (and other hazardous substances released at the FWF, including GenX) for the next 100 years, (b) obtaining new water sources or extending and/or modifying the existing water distribution system; (c) designing, permitting, constructing, operating and/or maintaining drinking water treatment and waste water treatment systems to remove the PFAS contamination (d) determining the source and cause of the PFAS contamination; and (e) investigating the existing or potential change in the character of the sources of water supply; testing its WWTPs and where necessary, the costs associated with addressing the WWTPs effluents and residuals as hazardous substances or wastes.

190. Plaintiff's response costs incurred to date and those incurred up to the date of entry of judgment are or will be consistent with the National Contingency Plan, 40 C.F.R. Part 300.

191. Plaintiff should not bear these costs; they should be borne by Defendants who are responsible for the contamination of Plaintiff's' Water System with PFOA, PFOS and GenX

50

192. Each Defendant is therefore a responsible party pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), and strictly liable for necessary response costs as the owner or operator of a facility from which there was a release of hazardous substances and PFAS that have contaminated Plaintiff's public drinking water supply.

193. By reason of the foregoing, Defendants are liable for Plaintiff's necessary response costs, and damages regarding PFOA and PFOS contamination to Plaintiff's PWSs' source waters, its PWSs' operating infrastructure, and its WWTPS located in southeastern North Carolina.

## SECOND CAUSE OF ACTION
### *DECLARATORY JUDGMENT*
### *(PURSUANT TO 42 U.S.C. §§ 9607(a) and 9613(g)(2) (CERCLA))*

194. Plaintiff reincorporates the preceding paragraphs above as though fully set forth herein.

195. By reason of the foregoing and pursuant to Section 113(g)(2) of CERCLA 42 U.S.C. § 9613(g)(2), Plaintiff is entitled to a declaratory judgment on liability and damages under 42 U.S.C. § 9607(a) for costs to remove and/or remediate the hazardous substances and PFASs contamination in (a) the Plaintiff Public Water System's supply as referenced herein; and (2) Plaintiffs WWTPs as referenced herein.

196. A declaratory judgment will prevent the need for multiple lawsuits as Plaintiff continues to incur costs for which Defendants are liable and will provide a resolution of the issue between the parties regarding further liability for future costs.

197. A declaratory judgment will establish Defendants' allocation of costs associated with addressing the contamination of the Public Water Systems and/or WWTPs, insuring an equitable and efficient response to the problem.

51

198. Public interest will be served in that a declaratory judgment will ensure a prompt and environmentally proper response to the contamination of Plaintiff's Public Water Systems and/or WWTPs.

199. Plaintiff will continue to incur additional remedial and response costs, including but not limited to costs to investigate, test, monitor, design, install, operate and maintain treatment systems, and take other measures to address the contamination of its property, its PWSs and WWTP systems and its drinking water supply located in Southeastern North Carolina with hazardous substances and PFAS.

200. Plaintiff's future costs are and will be consistent with the National Contingency Plan, 40 C.F.R. Part 300.

201. Plaintiff is thus entitled to a declaratory judgment regarding Defendants' liability for response costs and damages that will be binding on subsequent actions to recover further response costs or damages.

## VI. PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for a judgment against these Defendants jointly and severally for:

1. Compensatory damages and relief allowable under CERCLA for Plaintiff's response, remedial and restoration costs incurred as of and up to the date of entry of judgment;

2. Entry of a declaratory judgment awarding a judgment of liability against Defendants, jointly, severally and in the alternative to Plaintiff applicable to Aqua NC.'s costs incurred in the future in response to defendant's release of hazardous substances into the environment under and pursuant CERCLA § 113(g)(2), 42 U.S.C.S. § 9613 (g)(2);

52

3. Interest upon the damages and monetary relief awarded according to law;

4. An award of reasonable fees for attorneys and expert witnesses; and

5. Plaintiff's costs and disbursements relating to this lawsuit;

6. Any and all other and further relief available in the premises as the Court deems just, proper and equitable.

## VII. JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable as a matter of right.

Dated: April 3, 2026

Christopher M. Placitella, Esq.
   *(Special Appearance Forthcoming)*
Michael Coren, Esq.
   *(Special Appearance Forthcoming)*
Eric S. Pasternack, Esq.
   *(Special Appearance Forthcoming)*
Jared M. Placitella, Esq.
   *(Special Appearance Forthcoming)*
Drew M. Renzi, Esq.
   *(Special Appearance Forthcoming)*
**COHEN, PLACITELLA & ROTH, P.C.**
Two Commerce Square
2001 Market Street, Suite 2900
Philadelphia PA 19103-7054
Tel. (215) 567-3500
cplacitella@cprlaw.com
mcoren@cprlaw.com
epasternack@cprlaw.com
jmplacitella@cprlaw.com
drenzi@cprlaw.com

Respectfully submitted,

*/s/ John R. Fonda*
John R. Fonda (NC # 14103)
**NAPOLI SHKOLNIK PLLC**
1213 Culbreth Drive, Suite 227
Wilmington NC 28405-3639
Tel. (919) 374-1971
jfonda@napolilaw.com

Andrew W. Croner, Esq.
   *(Special Appearance Forthcoming)*
Patrick J. Lanciotti, Esq.
   *(Special Appearance Forthcoming)*
Nicholas H. Mindicino, Esq.
   *(Special Appearance Forthcoming)*

**NAPOLI SHKOLNIK PLLC**
360 Lexington Avenue, Floor 11
New York NY 10017-6502
Tel. (212) 397-1000
acroner@napolilaw.com
planciotti@napolilaw.com
nmindicino@napolilaw.com

Paul J. Napoli, Esq.
*(Special Appearance Forthcoming)*
**NS PR LAW SERVICES LLC**
1302 Avenida Ponce de León
San Juan PR 00907-3982
Tel. (833) 271-4502
pnapoli@nsprlaw.com

*Counsel for Plaintiffs*